IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In the matter of the Arbitration between: | § | |
| | § | |
| JANE DOE, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO._____ |
| | § | |
| MACQUARIE INVESTMENT | § | |
| MANAGEMENT BUSINESS TRUST | § | |
| | § | |
| *Respondent*. | § | |

## **PETITION TO COMPEL ARBITRATION**

Jane Doe petitions this Court under section 4 of the Federal Arbitration Act for an order compelling respondent Macquarie Investment Management Business Trust ("Macquarie" or "Respondent") to proceed with the arbitration currently pending before the American Arbitration Association (the "AAA"), in AAA Case No. 01-19-0000-0062 ("the Arbitration"), in the manner mandated by the parties' arbitration agreement. *See* 9 U.S.C. § 4.

## **INTRODUCTION**

1. Arbitration is a matter of contract, so parties to an arbitration may determine by contract the method for appointment of arbitrators. *See AT&T Tech., Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L.Ed.2d 648 (1986). Indeed, the Federal Arbitration Act expressly provides that where a method for appointment is set out in the arbitration agreement, the agreed upon method of appointment "*shall be followed*." 9 U.S.C. § 5 (emphasis added).

2. When that specific method is not followed, section 4 of the FAA provides that an aggrieved party may petition a United States District Court (that would otherwise have jurisdiction

over the underlying dispute) "for an order directing that such arbitration proceed in the manner provided for in such agreement," and that "[i]f the jury find that an agreement for arbitration was made in writing and that *there is a default in proceeding thereunder*, the court shall make an order summarily directing the parties to proceed with the arbitration *in accordance with the terms thereof*." 9 U.S.C. § 4 (emphasis added); *see also Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 673-74 (5th Cir. 2002) (stating that because the "AAA flouted the prescribed procedures" for arbitrator selection outlined in the employment agreement, the petitioner there "*could have sought an order from the district court compelling arbitration before a properly selected arbitrator* pursuant to sections 4 and 5 of the FAA.") (emphasis added).

3.  In this case, the parties agreed in Petitioner's employment agreement ("the Arbitration Agreement") that any "arbitration will be conducted under the Employment Dispute Resolution Rules of AAA," including their "procedures for the joint selection of an impartial arbitrator," and expressly incorporated those rules into the Agreement. *See* Arbitration Agreement, Ex. A, p. 11.

4.  The AAA's Employment Arbitration Rules and Mediation Procedures, in turn, provide that the AAA will follow this specific procedure:

- "The AAA shall send simultaneously to each party a letter containing an identical list of names of persons chosen from the Employment Dispute Resolution Roster";

- "If the parties are unable to agree upon an arbitrator, each party to the dispute shall . . . strike names objected to, number the remaining names in order of preference, and return the list to the AAA;" and then,

- "*From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve.*"

AAA Employment Arbitration Rules and Mediation Procedures, Rule 12.c.i-iii (hereafter "AAA

Employment Rules") (emphasis added).[1]

5. But just as "the AAA flouted the prescribed procedures" for arbitrator selection in the employment agreement in *Brook*, the AAA flouted the prescribed procedures for arbitrator selection in Petitioner's Agreement here: The evidence is overwhelming that the AAA did *not* invite the acceptance of an arbitrator to serve "in accordance with the designated *order of mutual preference*." *Id*. at Rule 12.c.iii (emphasis added).

6. Because the specific, contractually-agreed method for arbitrator selection was not followed, Petitioner respectfully requests that the Court, consistent with Congress's intent as expressed in section 4 of the FAA, issue an order directing that the "arbitration proceed in the manner provided for in such agreement." *See* 9 U.S.C. § 4.

## JURISDICTION AND VENUE

7. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000, and federal question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

8. This Court has personal jurisdiction over Respondent because it contractually agreed to venue in this District.

9. Venue is proper in the Southern District of Texas because a substantial part of the acts and conduct charged herein occurred in this district.

## THE PARTIES

10. Jane Doe is a citizen of the State of Texas and resides in this District. Petitioner is identified in this lawsuit by the pseudonym because this case involves a substantial privacy

---

[1] Available online at https://www.adr.org/sites/default/files/Employment%20Rules.pdf.

concern. As Petitioner alleges that she was sexually assaulted, her privacy concerns outweigh the customary practice of disclosing the Petitioner's identity.

11. Macquarie Investment Management Business Trust is a business trust organized under the laws of Delaware. The beneficial owners of Macquarie Investment Management Business Trust are Delaware Investments Management Company, LLC, Macquarie Management Holdings, Inc., Macquarie Affiliated Managers (USA) Inc., Macquarie Affiliated Managers Holdings (USA) Inc., Macquarie FG Holdings Inc., Macquarie Equities (US) Holdings Pty Limited, Macquarie Group (US) Holdings No. 1 Pty Ltd, Macquarie Corporate International Holdings Limited, Macquarie Corporate Holdings Pty Limited, Macquarie Financial Holdings Pty Limited, and Macquarie Group Limited.

12. Upon information and belief, none of the beneficial owners of Macquarie Investment Management Business Trust are themselves citizens of Texas, as are none of the members and limited partners of those owners.[2]

## JURISDICTIONAL ALLEGATIONS AND BACKGROUND[3]

*Petitioner's Employment with Macquarie and Events Leading to the Arbitration*

13. Macquarie is a global financial group with over 15,000 employees in 25 countries. Like most large businesses, Macquarie professes to be deeply committed to gender diversity. For example, in its 2019 Annual Report, Macquarie claims that it has made an "ongoing commitment

---

[2] Unlike a traditional trust, the citizenship of a statutory business trust is that of its constituent owners. *See Americold Realty Trust v. Conagra Foods, Inc*., 136 S. Ct. 1012, 1016 (2016).

[3] Petitioner has included a general outline of her underlying claims because she must: it is her burden to prove that the Court would otherwise have subject matter jurisdiction. *See Smith v. Rush Retail Centers, Inc.*, 360 F.3d 504, 505 (5th Cir. 2004) ("It is well established that the FAA is not an independent grant of federal jurisdiction."); *see also, e.g., Oteeva, LP v. X-Concepts LLC*, 253 F.App'x 349, 351 (5th Cir. 2007) ("Because of the absence of adequate diversity allegations *and the lack of sufficient evidence of diversity in the record* before us, we conclude that the plaintiffs have failed to satisfy their burden of establishing federal jurisdiction.") (emphasis added).

to achieving gender balance at all levels of the organization."[4]  In the same report, Macquarie similarly states that it seeks to "maintain equality for men and women in promotion decisions," to "retain women in at least the same proportion as men," and "to ensure the highest and fairest standards in how Macquarie hires, develops, pays and promotes staff."[5]

14. Unfortunately, Macquarie's statements appear to be little more than empty platitudes.  In reality, Petitioner's experience with Macquarie reveals a company no more concerned with gender equality than the men depicted in the *Wolf of Wall Street*.

15. Despite its public expressions concerning "gender balance," Macquarie, like most companies in the financial industry, remains heavily male dominated.  That gender imbalance was obvious to Petitioner on her first day of employment, in 2016, as an outside salesperson: *less than 10 percent of her peers were women*.  And, unfortunately for Petitioner, the other 90 percent of her peers, along with their male superiors, were not at all committed to "the highest and fairest standards" in the treatment of their female coworkers.

16. As part of her job, Macquarie required Petitioner to attend a sales meeting in New Orleans, along with other employees in her same position, their managers, and other sales staff.  During this company retreat, Macquarie encouraged its employees to drink to excess and—reflecting its true views on the value of women in the workplace—Petitioner's supervisor took all of the other employees under his supervision to a strip club to be "entertained" by topless women.  Later that same night, one of these co-workers tried to sexually assault Petitioner, and another gave

---

[4] 2019 Annual Report of Macquarie Group Limited and its subsidiaries, at 28 (available online at https://static.macquarie.com/dafiles/Internet/mgl/global/shared/about/investors/results/2019/Macquarie-Group-FY19-Annual-Report.pdf?v=9).

[5] *Id*. at 30.

her unsolicited career advice that included the suggestion that she should "suck her customer's cocks."

17. Petitioner immediately reported these disgusting incidents to Macquarie. Yet, despite investigating her claims and telling her that it found them to be credible, Macquarie did not punish these two co-workers in any meaningful way. Indeed, the male employee who tried to sexually assault Petitioner has since been given *leadership* positions within the company.

18. Instead, Macquarie chose to punish Petitioner. After being promoted on schedule the year before, Macquarie suddenly refused to promote her the next year, costing her at least $100,000 in lost commissions alone. Ultimately, Macquarie told Petitioner that she was going to be fired for alleged vague and subjective "performance" reasons, even though Macquarie's own objective sales data showed that she was, in fact, a top performer.

19. Then, in the course of mediating Petitioner's claim that Macquarie failed to promote her and threatened to terminate her in retaliation for reporting sexual harassment, her attorney revealed to Macquarie's counsel that a different employee had sexually assaulted Petitioner on another occasion—an incident she had not previously reported. Because she had never reported this traumatic incident to Macquarie, Petitioner's counsel also made it clear that it formed no part of the retaliation claim against the company.

20. The next day, Macquarie inexplicably retaliated against Petitioner yet again. This time, apparently afraid Petitioner might tell other employees about her experiences, Macquarie immediately banned her from its offices and removed her access to her company email account, effectively terminating her employment.

*The Arbitration Proceedings*

21. Because Macquarie's actions towards Petitioner were entirely at odds with and contrary to its public statements regarding its alleged concern for gender diversity, Petitioner was forced to bring an arbitration proceeding against the company alleging unlawful retaliation under Title VII of the Civil Rights Act of 1964.

22. Petitioner filed her demand for arbitration with the AAA on January 2, 2018. The deadline for Macquarie to pay its portion of the filing fee was January 18, which it missed. After Petitioner's counsel inquired by email about the payment status on January 22, the AAA granted Macquarie an extension of the payment deadline. On the last day, Macquarie paid the fee and the arbitration commenced.

      **a. The first arbitrator is appointed, then removed.**

23. On January 31, 2018, the AAA set a deadline of February 15 for the parties to submit their arbitrator ranking list. Macquarie missed that deadline, too.

24. Apparently prompted by the AAA, Macquarie then belatedly requested an extension, which the AAA immediately granted. In doing so, the AAA determined that good cause existed under its rules for the extension, allegedly because Macquarie did not timely receive the AAA's January 31 correspondence. Yet it was undisputed even by Macquarie that it did, in fact, receive the AAA's correspondence the same day it was sent. Despite Petitioner's objection that the AAA's good cause finding was erroneous (because it was based entirely on an alleged fact that Macquarie conceded was false), the AAA did not reverse its decision.

25. Following the parties' submissions of their arbitrator rankings, the AAA appointed a former state district judge to be the arbitrator ("the Initial Arbitrator"). Macquarie immediately objected to this appointment.

26. Macquarie claimed that the Initial Arbitrator had to be removed simply because she had served as a mediator, less than one time a year on average, in cases involving Petitioner's counsel. Although the AAA denied this request initially, it later reversed course and removed the Initial Arbitrator after Macquarie objected again.

### b. The AAA appoints a new arbitrator, but this time it does not follow the procedure required by the parties' arbitration agreement.

27. Following the Initial Arbitrator's removal, and consistent with Rule 12 and Rule 18 of the AAA Employment Rules, the AAA sent a list of 14 names for the parties to rank. *See* Ex. B. The AAA required each side to limit the number of strikes to five, s*ee id.*, and the AAA has since confirmed that when it matched the parties' strike lists, Macquarie's list indeed only had five strikes. *See* Ex. C. When the AAA announced the identity of the new arbitrator (the "Replacement Arbitrator"), however, it became obvious that the method for arbitrator selection outlined in Rule 12 had not been followed.

28. The Replacement Arbitrator was ranked seventh on Petitioner's strike list. *See* Ex. D. Thus, even assuming that *all five* of Macquarie's strikes matched the first five names on Petitioner's list (itself an unlikely proposition), then the *sixth* name on Petitioner's list should have been chosen. But the sixth person on the ranking list has since confirmed that he was *never invited* to serve as the arbitrator. *See* Ex. E.

29. If the sixth person on the ranking list did not decline the appointment, and Macquarie submitted only five strikes (which the AAA says is true), then it should not be be possible for the *seventh* person on Petitioner's list to have been selected—assuming the AAA, in fact, followed the procedure for selection in its Employment Rules. *See* Rule 12.c.iii ("From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve.").

8

30.     Indeed, neither the AAA nor Macquarie can explain this discrepancy, despite Petitioner's repeated requests for an explanation. In any event, neither disputes that the sixth person on the strike list was not invited to serve. Beyond that, Macquarie has refused to disclose its own ranking list, and the AAA has refused to disclose Macquarie's rankings or offer an alternative explanation that might support a claim that Rule 12 was followed.

31.     Finally, both the AAA and Macquarie have refused to agree to the removal of the Replacement Arbitrator and the selection of yet another replacement arbitrator using the correct, contractually agreed method of selection.

### PETITION TO ENFORCE THE METHOD FOR ARBITRATOR SELECTION PROVIDED IN THE ARBITRATION AGREEMENT

32.     The parties consented in the Arbitration Agreement to follow Rule 12 of the AAA Employment Rules. Rule 12 required the AAA to "invite the acceptance of an arbitrator to serve" strictly "in accordance with the designated order of mutual preference" from the approved names on both strike lists. AAA Employment Rule 12.C.iii. The AAA did not do that.

33.     Accordingly, Petitioner requests that this Court issue an order "directing that such arbitration proceed in the manner provided for in such agreement." *See* 9 U.S.C. § 4.

### JURY DEMAND

34.     Petitioner hereby demands a trial by jury.

### CONCLUSION

35.     Petitioner does not seek relief from this Court for the AAA's apparent bias in favor of Macquarie in granting an extension to pay the arbitration fee, improperly communicating with Macquarie about its failure to timely submit its strike list, granting Macquarie an extension to submit its strike list based on imaginary facts, or removing the Initial Arbitrator without any reasoned basis at Macquarie's request. Those actions admittedly relate to the fairness of the

proceeding, and they are concerning, but Petitioner concedes that those issues must be addressed another day.

36. Instead, Petitioner seeks relief because the AAA failed to follow the selection procedure outlined in Rule 12, which was incorporated by reference into the parties' Arbitration Agreement. Arbitration "is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989)). Parties are also free to "specify *with whom* they choose to arbitrate their disputes." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683 (2010).

37. Because the Replacement Arbitrator was not selected in accordance with the Arbitration Agreement, Petitioner asks the Court for an order "directing the parties to proceed with the arbitration in accordance with the terms thereof." 9 U.S.C. § 4.

Respectfully submitted,

STURM LAW, PLLC

*/s/ Charles A. Sturm*
CHARLES A. STURM
csturm@sturmlegal.com
*Attorney in Charge*
Texas Bar No. 24003020
Federal Bar No. 21777
723 Main Street, Suite 330
Houston, Texas 77002
(713) 955-1800 [Telephone]
(713) 955-1078 [Facsimile]

